The case for this morning is United States v. Patel. Mr. Ackerman. Good morning. Court, please. You have to get up to the podium, Mr. Ackerman, so we can record you properly. Very little of what I'm about to say should be recorded anyway. Mr. King is sitting there. He's a very fine assistant U.S. attorney. He's eloquent, and I'm sure I will not be able to match his eloquence for the government. That said, this sentence of 25 years should be vacated and remanded for reasons that appear in the brief, such as We believe the district court unfairly and unreasonably imposed a 25-year sentence, gave rise to what we would like to call unwarranted disparity, and this court in 2018 issued a landmark decision in United States v. Solomon. And in that case, the court dealt with, in part, these questions, including whether the same district court judge imposes a greater sentence the first time with the first defendant, a lesser sentence the second time with the second defendant, and whether that should be the subject of a disparity inquiry. Now, of course, with the second defendant, Mr. Fisher, the judge gave him the statutory maximum. It wasn't available to the judge to give him any more. That is correct. And it hadn't happened yet at the time Mr. Patel was sentenced. That is true, and the district court had not seen the Fisher PSR or the sentencing data. Now, didn't Mr. Patel engage in all sorts of behavior between guilt and sentencing that Mr. Fisher did not engage in? We don't know what Mr. Fisher did or didn't do. What we do know is that Mr. Patel is in no danger of getting a good conduct medal. There is little question, little question that he used his otherwise brilliant, brilliant mind to engage in some financial chicanery, none of it violent, I might add, to the point where he ended up with about $4 million after all was said and done. And Mr. Fisher, according to the government, ended up with $1.2 million out of the $179 million that they scammed under the flagship of their farmer's financial, whatever it was called. Now, it brings us not only to sentencing disparity because we're not talking about the equivalent of a year or two difference. We're talking about 15 years difference. And this court has not spoken to the question, wait a second, in Solomon there was a two-year, more or less, I believe it was, actually two and a half year, from top to bottom because Solomon contended that he should have got a lower sentence, not the seven-year sentence, because his co-defendant, who was one of the primary architects, got a three-year sentence, whatever it was. But there was a two and a half year spread. And I cite in our brief, our reply brief, a case where there was a 50 or 55-month disparity. And the court said that's not very much. It's not enough to concern ourselves with. But, Mr. Ackerman, of course disparities are one of the factors in 3553A. But just for the record, it's worth noting that the 300-month sentence was well below what the guidelines would have advised. The guideline sentence, according to the government's calculations, and we don't dispute it, was 100 years. It was astronomical, yes. Up the chart, so to speak. Right, right, right. And did the judge impose that? The government asked for a 30-year sentence. The court imposed a 25-year sentence. But while imposing that sentence, and we feel this is worthy of comment, the court went on to take Mr. Patel to task. Because of all places, he may have been fleeing to Ecuador. Now, what is wrong with Ecuador? I don't know. Charles Darwin liked it. He had part of his origin of the species from that island, which I can't pronounce the name of, but it's part of Ecuador. So, look. I mean, you read Judge – maybe Judge Kokora said a little more than he should have. But the fact is he's saying people like you get caught eventually, almost inevitably. So why would you do it? You're doing it because you thought you were going to be able to slip away before you were called to account for your financial actions, misbehavior. But for what must have been an amazing event, but for this quick arrest as he gets onto the charter plane to go to Ecuador, he might have gotten away with it. It looks like they came pretty close. And the judge does say, look, the United States isn't perfect, but why are you going to give up your American citizenship and not just go to Ecuador, but apply for asylum in Ecuador? That's a big thing to do. It's a very significant move. So the judge is trying to understand how does somebody engage in this kind of behavior and what sort of penalty do we need to give you? I beg to differ with the court. The district judge's comments concerning the defendant's lack of patriotism, if you will. He doesn't ever use that word. No, he doesn't. Of course not. But he does refer to how America has been so good to him. America has educated him. And here he's going to leave America and on and on. If it pleases the court, that gives rise, in our view, to the potential, not real, not actual, but the potential for bias. And if there's that potential for bias, that fits right into the unwarranted disparity argument. I read the judge's point as being this was a perpetuation of the fraud that was going on because he was going to be making a fraudulent application for asylum, claiming that he had a valid basis for political asylum in Ecuador. When the United States has treated him well. And it's just one more fraud on top of a massive amount of additional fraud. That's how I took the district judge's point. Not that he was making a point about his patriotism. The district court. Look, I've had the privilege, the absolute privilege, of appearing before Judge Kokoris for, golly, the better part of 30 years. Do I feel he's prejudicial? Do I feel he's unfair? No, I don't. If I had my druthers and we have cases in the lower court, I'd love to be in his court every day. But that's not the way this case went. Here, his comments were so out of touch with the way he conducts his courtroom that you have to read it three or four times to get a flavor for what he is saying. And what he is saying here, and I really regret this. What he is saying here is, hey, excuse me. You're born in America, you're raised in America, everything you have you got in America, and now you're leaving America for what? For what? And Ecuador, of all places, supposing it was Ireland, supposing it was Iraq, Iran, or who knows, Israel. Although in Israel he may have been welcomed. I don't know. But having said that, it's our view, respectfully, that at the very least he should have a limited remand with an opportunity for Judge Kokoris or a different sitting court judge to take another look at his sentence in light of both the comments of Judge Kokoris and the sentence imposed on Mr. Fisher. All right. Thank you. Thank you. Mr. King. Good morning. If it may please the court, my name is Patrick King, appearing on behalf of the United States. The district court in this case committed, in imposing the below guideline sentence, committed no procedural error as is suggested. There was no bias, real, actual, imagined, or potential. There was a distinction in this court when the court addressed or made reference to Ecuador and why Ecuador. It was more of a rhetorical question. And what the court was pointing out was the defendant had no personal, familial, or prior business ties to this country. But what was in the record was that the defendant, approximately eight or nine months prior to the time that he entered a guilty plea, had sought to avoid imposition of a sentence. Is there evidence in this record that he was, as it were, shopping around to see which countries might be more inclined to grant asylum? Yes, Your Honor. Attached to the record at 113 is an exhibit which was the interview of the defendant at the Kissimmee Airport when he was arrested by the FBI. He indicated that he... That's when he was on the verge of getting... How in the world did they know that? That's not in the record.  He indicated that he had considered India and had, in fact, paid and bought for an Indian passport. And he had considered going to India and had represented to the Indian government that he had been treated unfairly here in a prosecution. But he settled on Ecuador because of the difficulty of extraditing him from Ecuador, and he perceived Ecuador to be a more difficult place for the United States to extradite him. Is there no extradition treaty between the United States and Ecuador, or are there terms? It's very unclear. I mean, that's easy to find out. The State Department has a treaties-enforced document that will tell you. It's not in the record, Your Honor, but when we inquired, we were advised. It was not very clear that we could obtain extradition from there. Okay, that's fine. There may be accords in effect, but the perception, both of the defendant and the State Department, was it was very likely we could never obtain him from there. What the court also pointed out was is that the defendant went to considerable efforts to pay for this. In so doing, not only did he charter flights, he hired individuals, he bought a passport. All those funds were things that could have gone. When you say he bought a passport, I assume this is a fraudulent passport. The record indicates that he paid $3,000 to $4,000 to buy, through friends, a passport purportedly issued by the government of India. And he doesn't have dual citizenship or anything, right? No, Your Honor, the record indicates that he was a citizen of the United States. There was a warranted disparity in this case. The individuals were charged with different crimes. There was a difference in roles. There was no acceptance on the part of the defendant, where there was on the part of Mr. Fisher. The criminal history was different. It was four for the defendant, Patel, and one for Mr. Fisher. The court indicated that it had considered the defendant's argument that they should be treated as equal. It is a pretty staggering difference, 15 years for roughly the same financial crimes. Your Honor, yes, the time is different, but you can't just look at the time because the charges set forth the provable conduct. And more importantly, in the court looking at this, the court found that the defendant's conduct was more significant of the two, that he controlled all the proceeds, that he was principally responsible for all the losses. The record established that he alone had contact with all of the victims. He alone fabricated all of the documents, which were multiple. He forged the signatures of the USDA officials. He had sole control of the proceeds, and he profited to a much greater degree. In addition to that, he committed an additional crime. While on bond, he exploited the court's good graces. He asked for the benefit to help himself and thereby help the victims recoup the proceeds. And on four separate occasions, he delayed that all for the purpose of perfecting his flight and to secure additional funds for him to restart his life in Ecuador. He had a lot of money with him, right, as he was going to Ecuador. Yes, Your Honor. He had a checkbook, which had approximately $6.5 million, and then there was a bank statement for another sham entity that had been created while he was on bond for in excess of $1 million. There were references in the documents that he had that there were additional assets that he was seeking to transfer. But while on bond, he committed or attempted to commit another $19 million worth of fraud using the USDA, and he personally causing the fabrication of another identity to facilitate that. Then there is the actual effort of the flight, and before the judge, was the fact that when Mr. Patel was arrested at the airport in Florida, he was held in custody. And while in custody, on recorded jail phones, he attempted to perfect one of the frauds to continue committing fraud while in custody. Where did the authorities find this multi-page set of documents that were attached to the, I think this was attached to the PSR with his elaborate plan for the flight to Ecuador and the asylum application and how he would live there and the household personnel he would hire and so forth. The documents were contained within his luggage. So there were documents which, there's a to-do list, there's a calendar of various dates, and there's discussion points as to what he should do to obtain asylum. As well as the purchase of luxury vehicles and homes and setting up business. If there's no further questions, I would ask the court to affirm the sentence. Thank you. All right, thank you very much. I'll give you a minute of rebuttal, Mr. Ackerman, if you would like it. I won't take the entire minute. Okay. Did you read this one? There is a consulate for Ecuador on Michigan Avenue. My understanding is they have extradition. They don't do it always or uniformly, but they do do it. The last thing is the district court at this sentencing said that there was a parity of misconduct between Mr. Fisher and Mr. Patel. They both were necessary for the frauds. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.